Decided 18 July, 1904; modified 28 August, 1905.

### HARRINGTON v. DEMARIS.

77 Pac. 603, 82 Pac. 14, .... L. R. A. .....

ADVERSE USE—LIMITATION OF ACTION.

1. A riparian owner claiming a right to use part of the water of a stream cannot assert an adverse right to any water as against an upper proprietor whose use has not been curtailed so that he has been called upon to notice the claim of the lower owner.

ADVERSE USE OF UNCLAIMED WATER.

2. The use by an upper riparian proprietor of water from a spring which is not tributary to the stream is not adverse to the rights of a lower owner on the same stream.

ARTIFICIAL CHANGE OF WATER COURSE—RIPARIAN RIGHTS.

3. Where the respective owners of different tracts of land, by a concert of action, remove a dam, and permit water from the springs of a swamp to run into a stream which the water from the springs had never run into

before, they thereby make the springs tributary to the stream and subject
to the rules of law applicable to riparian ownership.

EVIDENCE REVIEWED.

4. In this suit the evidence seems to sustain the finding of the trial
court as to the amount of water to which plaintiff is entitled.

WATER RIGHTS—REMOVING INTERFERENCE.

5. Though a dam maintained by defendant interrupts the flow of water
to which plaintiff is entitled, defendant need not remove it, where the
water would then injure his land, so long as he adopts other means to
bring the water to plaintiff's lands.

From Umatilla: WILLIAM R. ELLIS, Judge.

Statement by MR. CHIEF JUSTICE MOORE.

This is a suit by S. F. Harrington against A. L. Demaris
to enjoin interference with the flow of water in the channel of
a creek to plaintiff's premises. It is alleged in the amended
complaint, in substance, that until August, 1900, a natural
stream of water, consisting of about 480 inches, had its source
from time immemorial in certain springs arising in and issuing
from the land of one R. M. Dorothy, in Umatilla County, and
flowed westward through defendant's land, thence across plain-
tiff's premises, and through the lands of "other persons,"
whereby plaintiff's premises were subirrigated, and he and his
predecessors in interest had used such water for a beneficial
purpose; that more than thirty-five years prior to the bringing
of this suit his grantor dug a ditch from the channel of the
stream, diverting therefrom 120 inches of water, which was con-
ducted to the land now owned by him, and there continuously
used adversely to the defendant and to all other persons for more
than ten years prior to August, 1900, in irrigating crops and an
orchard; that after such diversion and appropriation there
remained in the channel of the stream 360 inches of water,
which continued to flow across plaintiff's premises, "and on and
to the lands of other persons," and which plaintiff used for stock
and domestic purposes, and claims the right to have such quan-
tity continually to flow across his land; and that in August,
1900, the defendant unlawfully placed a dam in the bed of the
stream, and prevented the water from flowing to plaintiff's
premises, thereby injuring the grass, crops, and fruit trees
growing thereon, to his damage in the sum of $2,000.

The answer denies the material allegations of the complaint, and, for a separate defense, avers, in effect, that water originally collecting in a swamp on Dorothy's land never reached plaintiff's premises by any channel having a bed or banks, but that during the rainy season, when the accumulation was greatest, the overflow found its way westward on the surface to defendant's land, where it sunk in the ground and was lost, and another part found its way northward, emptying into an old channel of the Walla Walla River; that about fifteen years ago Dorothy caused the swamp to be drained by digging one ditch northward to such old channel, and another westward to the boundary of his land, where defendant appropriated the water flowing therein, and also extended the latter ditch northward to the old channel, in which he placed a dam, and, by means of another ditch, conducted all the water flowing from the swamp, in the irrigating season, to his premises, where it was appropriated to a beneficial purpose, and ever since has been used adversely to the plaintiff and to all other persons. For a further defense, it is alleged that from time immemorial the stream mentioned in the complaint has had its only source in a spring of water issuing from defendant's land, which, augmented by the flow of water from other springs on his premises, originally consisted of a volume twelve inches wide and of the same depth, two thirds of which for more than twenty-five years has been adversely used by him and his predecessors in interest in irrigating crops, the remainder being permitted to flow to plaintiff's premises; that from natural causes the volume of water originally flowing in this stream has gradually diminished, and the surplus, after supplying the defendant's use, sinks into the porous soil before reaching plaintiff's land; that in April, 1900, defendant built a new dam in the stream to take the place of an old one therein, but diverts no more water thereby than formerly, "and that defendant's diversion and use of the water of said stream has at all times been, and now is, a right which belongs to him absolutely, as appurtenant to the land by him owned." It is also alleged that, in the fall of 1875 or 1876, defendant's predecessor in interest diverted and appropriated to a beneficial purpose two thirds of

all the water flowing from springs on defendant's land, and ever since that time such water has been used adversely to plaintiff and to all other persons, and that during the last five years, owing to the diminution by natural causes of water flowing from these springs, the quantity now used by defendant is less than that originally appropriated by his predecessors.    The reply having put in issue the allegations of new matter in the answer, a trial was had before the court, which found the facts, in substance, as alleged in the complaint, and, as conclusions of law deducible therefrom, that plaintiff was entitled to have all obstructions placed in the stream removed, so as to permit one half the water arising from the springs on Dorothy's lands, not exceeding sixty inches, to flow in the channel to his premises, where he could divert forty-eight inches into his ditch, and permit twelve inches to flow in the bed of the stream through his land, but in no event to take more than one half the entire flow, and that the defendant was entitled to use the remaining quantity after supplying that given to plaintiff, who was awarded damages in the sum of $700 by reason of his deprivation of the use of the water; and, having given a decree in accordance therewith, the defendant appeals.          MODIFIED.

For appellant there was a brief over the names of *Henry J. Bean, Stephen A. Lowell* and *Thomas G. Hailey,* with an oral argument by *Mr. Bean* and *Mr. Lowell.*

For respondent there was a brief over the name of *Carter & Raley,* with an oral argument by *Mr. James H. Raley.*

MR. CHIEF JUSTICE MOORE delivered the opinion.

An examination of the pleadings, the substance of which is hereinbefore set out, shows that the controversy involved in this suit relates to the use of water from a stream by riparian proprietors; and, though appropriations of water are mentioned in the complaint and answer, no priority of possession of public land is alleged by either party as a foundation for a vested and accrued right to the use of such water (Rev. Stat. U. S. § 2339, U. S. Comp. St. 1901, p. 1437), nor is it averred by either party that, after the necessary demands of a prior appropriator had

been supplied, there remained a quantity which he appropriated: *Simmons* v. *Winters,* 21 Or. 35 (27 Pac. 7, 28 Am. St. Rep. 727).; *Carson* v. *Gentner,* 33 Or. 512 (52 Pac. 506, 43 L. R. A. 130) ; *Browning* v. *Lewis,* 39 Or. 11 (64 Pac. 304) ; *McCall* v. *Porter,* 42 Or. 49 (70 Pac. 820, 71 Pac. 976).

1. It will be remembered that the complaint states that plaintiff and his grantor had used the water in question more than ten years adversely to the defendant, but, as his land is situated on the stream below that of the defendant, and the testimony fails to show any recognition by the latter of his alleged right, his use has not been adverse to the defendant: *North Powder M. Co.* v. *Coughanour,* 34 Or. 9 (54 Pac. 223) ; *Bowman* v. *Bowman* 35 Or. 279 (57 Pac. 546).

2. So, too, the answer alleges that the water issuing from the springs on Dorothy's land was used by defendant adversely to plaintiff more than ten years prior to bringing this suit. If the water from these springs was never tributary to the stream in question, defendant's use thereof could not have been adverse to plaintiff, who, as a riparian proprietor, was never entitled thereto. The testimony shows that, though the volume of water flowing in the stream to plaintiff's premises was annually diminishing, his use thereof was undisturbed until about 1898, and, if it be conceded that the water from the springs on Dorothy's land originally formed a part of this stream, the defendant's interference therewith, not having been sufficient to enable him to invoke the statute of limitations, his use of the water could not toll the plaintiff's right thereto. This eliminates the question of adverse use by the respective parties, and confines the inquiry as follows: (1) What constitutes the waters of the stream flowing through the lands of the parties; (2) has the defendant, as a riparian proprietor, taken more than his share of the water of the stream; and, if so, (3) what damage has the plaintiff suffered in consequence thereof?

3. Considering these questions in their order, the testimony shows that one R. M. Dorothy owns the east half of section 21 in township 5 north, of range 36 east of the Willamette Meridian,

the defendant the west half of that section, and the plaintiff, the southeast quarter and the east half of the northeast quarter of section 20 in that township and range, except, however twenty-nine acres from the north end of the latter land, and also one acre therefrom on which a schoolhouse has been erected; that the Walla Walla River now flows westerly through the northern part of these sections near a bluff, but prior to 1870 it ran in an old channel about 200 yards south of its present bed; that a small stream, known as "Spring Branch," is found on defendant's land, and flows southwesterly to and through plaintiff's premises, emptying into the river at a point below. This branch was probably an older channel of the river, for, during freshets in the latter stream, before the channel was changed to its present bed, the water overflowed the banks on the south and passed down Spring Branch, and, to prevent the stream from permanently following such course, plaintiff's grantor, George De Haven, and others, constructed a dam on the south bank of the river on the line of the overflow. About fifteen acres of Dorothy's land was originally a swamp, in which brush and tules grew, and where the water during the entire year stood about three feet deep; but about 1884 he drained this marsh, and discovered that it was caused by three large springs therein. It is alleged in the complaint, and the court found, that the source of Spring Branch was the springs on Dorothy's land, though defendant maintains that the fountain head of this stream is a spring on his premises, and that the water from the springs on Dorothy's land never reached Spring Branch in any channel, and, this being so, the court erred in making its finding to that effect, and in rendering the decree based thereon. Each party introduced in evidence a map on which is severally delineated the land owned by the plaintiff, by the defendant, and by Dorothy; but no survey of the stream, river, old channel, or dams ever having been made, the charts do not coincide in important particulars, and hence neither can be adopted as correct, except in so far as the representations thereon are corroborated. The plaintiff contends that the dam placed in the stream, constituting an obstruction to the flow of water from the springs on Dorothy's land to his premises,

is built in the old channel. The defendant maintains, however, that the dam complained of is placed in Spring Branch, and permits as much water to flow to plaintiff's land as passed an old dam which was supplanted by the new structure, and that Spring Branch is separate from the old channel. Whether or not Spring Branch is a part of the old channel of the Walla Walla River is of no consequence, but the identity of the dam that produced the injury of which plaintiff complains is important.

Considering whether the water from the swamp on Dorothy's land ever found its way originally into Spring Branch, we think the preponderance of the testimony shows that it flowed westward therefrom on the surface into this stream, and also northward in the same manner into the old channel. When Dorothy drained this swamp, he dug a ditch therefrom northward, and conducted water into the old channel, and also made another ditch westward from the swamp to the boundary of his land, where defendant continued the conduit north, causing the water flowing therein to be discharged into the old channel. The marsh having been reclaimed, it was ascertained that the swamp was caused by three large springs, known as No. 1, which discharges its water westward, and Nos. 2 and 3, which emit their waters northward, and all now emptying into the old channel. This change in the flow of water from spring No. 1 probably causing a scarcity, George De Haven, plaintiff's grantor, Enoch Demaris, defendant's father and predecessor in interest, and one Highby Harris, who then owned land through which Spring Branch flowed, about 1885, removed a part of the old dam, built on the bank of the old channel to prevent an overflow, and let the water issuing from these springs flow down such branch, in which, as we understand the testimony, the greater part thereof has continued to glide for more than fifteen years, until the summer of 1900, when the dam was replaced, and the water from the springs conducted in the old channel to a dam built therein, where by means of a ditch it is diverted and used in irrigating crops and an orchard growing on defendant's land.

Mr. Gould, in his work on Waters (3 ed.), § 263, in elucidating the principle that water which does not flow in a channel is not subject to the rules regulating the rights of riparian proprietors, says: "But if a well-defined natural stream empties into a swamp or lake, where all definite channel is lost, and emerges again into a well-defined channel below, it is a question of fact, dependent upon the extent of the swamp or lake, whether it is the same stream; and, if it is, the owners of land upon the lower stream have riparian rights, and an owner of land upon the stream above the swamp or lake is not entitled to divert water therefrom to their injury." In the next section the learned author, discussing this question further, says: "A stream does not cease to be a watercourse, and become mere surface water, because at a certain point it spreads over a level meadow several rods in width, and flows for a distance without defined banks before flowing again in a definite channel." In *Case* v. *Hoffman,* 84 Wis. 438 (54 N. W. 793, 20 L. R. A. 40, 36 Am. St. Rep. 937), it was held that the flowing of water upon and beneath the surface of lands between a natural lake of about sixty acres in extent, and a creek into which they discharge, constitutes a watercourse, where the flow is all in the same direction, and a part of the way along a distinct and plainly marked channel, although for some of the distance it spreads over wide reaches of marsh and swamp lands, and percolates the soil in many and most places between the lake and creek. To the same effect, see *Cox* v. *Bernard,* 39 Or. 53 (64 Pac. 860), and *Mace* v. *Mace,* 40 Or. 586 (67 Pac. 660, 68 Pac. 737).

Though there is a conflict in the testimony respecting the character of the original outlet from the swamp westward—some of the witnesses insisting that it was well-defined and others that the water flowed on the surface—we think it was in fact a watercourse emanating from the springs into a swamp of sufficient extent to render it and spring No. 1 tributary to Spring Branch. The water flowing in the outlet from the swamp northward into the old channel never originally reached Spring Branch, but when De Haven, Demaris, and Harris, by a concert of action, took out the dam, and let such water, together with that from spring

No. 1, into the branch, they thereby made these springs tributary to such stream, and subject to the rules of law applicable to riparian ownership: *Cottel* v. *Berry,* 42 Or. 593 (72 Pac. 584). In that case Mr. Justice WOLVERTON, in discussing the subject said: "It seems to be a rule of law that where owners of different parcels of land conduct water across the same in an artificial channel, and do not define their respective interests in the water, their reciprocal rights thereto are to be measured and determined as if they were riparian owners upon a natural stream." In *Burk* v. *Simonson,* 104 Ind. 173 (2 N. E. 309, 3 N. E. 826, 54 Am. Rep. 304), it was held that where a change is made in the flow of a natural watercourse, either artificially or otherwise, and riparian owners acquiesce in the new state of the stream for so long a time that new rights accrue, or may be presumed to have accrued, such acquiescence is binding, and precludes a restoration of the stream and its surroundings to their original condition. In the case at bar, we think the testimony warrants the conclusion that after defendant continued the west ditch north on his premises, so as to conduct the water from spring No. 1 into the old channel, the riparian proprietors removed a part of the old dam, permitting the water issuing from Dorothy's land to flow down Spring Branch, thereby making it tributary thereto and entitling them to a reasonable use thereof.

4. The parties being riparian proprietors, and entitled to the reasonable use of the water flowing in Spring Branch, including that issuing from the springs on Dorothy's land, the next question to be considered is whether the defendant has taken more than his share. In *Jones* v. *Conn,* 39 Or. 30 (64 Pac. 855, 65 Pac. 1068, 54 L. R. A. 630, 87 Am. St. Rep. 634, 53 Cent. Law Jour. 128), Mr. Chief Justice BEAN, after reviewing numerous decisions involving the right of a riparian proprietor to use the water flowing through his land for irrigation, deduces the following conclusion as applicable to the arid region of the United States: "It is accordingly now quite generally held in this country and in England that, after the natural wants of all the riparian proprietors have been supplied, each proprietor is

entitled to a reasonable use of the water for irrigation purposes." In enforcing this rule, it is further said in the opinion: "For the protection of the rights of the several proprietors, it has even been held that a court of equity may, in a proper case, apportion the flow of the stream, after the natural wants of the several proprietors have been satisfied, in such a manner as may seem equitable and just under the circumstances." In *Harris* v. *Harrison,* 93 Cal. 676 (29 Pac. 325), it was held that the inquiry as to what constituted a reasonable use of the water of a stream for irrigating the land of a riparian proprietor was a question of fact, depending upon the circumstances appearing in each particular case; the court saying: "The larger the number of riparian proprietors whose rights are involved, the greater will be the difficulty of adjustment. In such a case the length of the stream, the volume of water in it, the extent of each ownership along the banks, the character of the soil owned by each contestant, the area sought to be irrigated by each—all these and many other considerations must enter into the solution of the problem; but one principle is surely established, namely, that no proprietor can absorb all the water of the stream, so as to allow none to flow down to his neighbor."

In the case at bar it is impossible to determine from the testimony any of these elements, though it will be remembered that the complaint states that, after this stream crosses plaintiff's premises, it flows "on and to the lands of other persons." If others have any rights in or claims to the use of the water flowing in Spring Branch, it is needless to say that, not having been made parties, the decree herein cannot possibly affect them. If they are entitled to a reasonable use of water, defendant's rights as a riparian proprietor must necessarily be abridged just in proportion as theirs are judicially determined. The plaintiff having been decreed sixty inches of water, providing that does not exceed one half the volume flowing in the branch, the defendant has no cause to complain, because under no circumstances would he be entitled to more, assuming that the demands of the parties are equal. The testimony shows that in 1875 plaintiff's grantor dug a ditch so as to tap Spring Branch on the east bound-

ary of his land, and conducted water therein, which since that time and until August, 1900, has been used in irrigating about fifteen acres, which has been cultivated as an orchard, garden, lawn, and meadow. The plaintiff, as a witness in his own behalf, says that, if all the water from the springs on Dorothy's land flowed into Spring Branch, the volume therein would be about three feet wide and from seven to eight inches deep, and, in speaking of the capacity of his ditch, said it was about two feet wide and from two to three inches deep; and, the court having awarded him forty-eight inches of water for the purpose of irrigation, we conclude the quantity so decreed is the measure of his right. The decree, however, does not prescribe how such quantity shall be ascertained, but, as plaintiff's testimony seems to imply that he estimates it to be square inches of the vertical cross-section of the stream as it ordinarily flows, he is entitled to that quantity, without pressure, to be measured in a box twelve inches wide, placed in his dam on a grade as near as possible with the fall of his ditch, and the twelve inches decreed him in the bed of the creek will be measured in the same manner at his dam in a box of the same dimensions, set as near as possible on the same grade as the average fall of the stream as it flows through his land.

We think the weight of the testimony shows that the dam which confines in the old channel the water issuing from the several springs on Dorothy's land is the primary cause of the injury complained of. Such dam, and also the new one built on defendant's land, will be removed sufficiently to permit the quantity of water awarded plaintiff to flow to his premises, provided, however, it does not exceed at any time one half the volume flowing in Spring Branch.

This brings us to a consideration of the damages sustained by plaintiff. The trial court having visited his premises with the parties and their attorneys, allowed him $700, but the considerations which led the court to award this sum are not contained in the transcript, although that comprises the entire testimony. The lowest estimate placed by any witness on the damage done was $1,000, and it would seem that such sum ought to have been

awarded; but the defendant, not having insisted thereon at the trial in this court, is evidently satisfied therewith.

From these considerations, it follows that the decree is affirmed.

Decided 28 August, 1905.
## ON REHEARING.

MR. JUSTICE MOORE delivered the opinion of the court.

5. A rehearing having been granted in this cause upon the question of damages alleged to have been sustained by the plaintiff, the writer, in company with counsel for the respective parties, visited the locus in quo and saw quite a volume of water flowing nearly across the defendant's premises, but entirely sinking into the ground before it reached plaintiff's land. It was claimed by defendant's counsel at the former trial in this court that the damage which plaintiff claims to have suffered was due to his failure to remove the sedimentary deposit in the bed of the stream near the east border of his land, so as to permit the water to flow to his premises from the point where it disappears. From the examination made we conclude that plaintiff's failure to secure water for irrigation resulted in part from his neglect to keep the channel free from debris. The primary cause of the injury, however, is attributable to the defendant's diversion of quite a quantity of water which for many years had constantly flowed to plaintiff's premises, and in consequence of such change many valuable fruit trees belonging to the plaintiff had died. Believing that the damages thus sustained could have been very much mitigated by an effort on plaintiff's part to conduct to his land the water that sunk into the ground, we conclude that the sum of $300 would be a fair compensation for the injury directly traceable to the defendant, and the plaintiff will be allowed that sum, instead of the award made by the trial court.

The defendant's counsel complain of that part of the decree heretofore rendered by this court which directs the new dam built by their client to be removed sufficiently to permit water to flow to plaintiff's premises, asserting that to open this dam

would necessarily result in washing deep channels in the defendant's meadow, to his great injury, and they suggest that he be permitted, in case the former opinion in respect to the division of the water is to be adhered to, to conduct water in irrigating ditches or other channels to supply the quantity awarded. The means adopted by the defendant to bring the water to the premises of plaintiff must be unimportant, so long as the quantity necessary to supply the use is furnished at the proper place. The decree will therefore be that the defendant conduct to the place where the water sinks into the ground, in such channels as he may reasonably select, the quantity of water awarded to plaintiff, or that, upon the defendant's failure or refusal to comply herewith and to keep the water flowing in such conduits during the irrigating season, the new dam be opened as hereinbefore specified. The plaintiff is hereby licensed to enter the defendant's premises at the point where the water sinks into the ground to remove the sediment, and to conduct the water from that place to his land, doing as little damage as possible.

The decree of the lower court will therefore be modified in the particulars herein indicated, the plaintiff to recover his costs and disbursement in this court and in the court below.

Modified.

Decided 3 January, 1905.