Argued 27 January; decided 10 February, 1902.

## MACE *v.* MACE.

[67 Pac. 660, 68 Pac. 737.]

WATERS—BANKS OF STREAMS—CUTTING NATURAL DEPRESSIONS.

1. Where there is a natural depression in a river bank, with a well-defined channel leading therefrom through which the water is accustomed to flow during the irrigating season, thereby rendering the plaintiff's lands highly productive, the waters flowing through such channel partake of the nature of a natural stream to such extent that defendant cannot, by damming up such outlet, divert such water to plaintiff's injury: *Cox* v. *Bernard,* 39 Or. 53, cited.

WATERS—CONTROL OF ARTIFICIAL WORKS.

2. When plaintiff's rights as to a stream are only those of a riparian proprietor, and are not based on contract or usage, the court cannot decree the maintenance and regulation of artificial works constructed by defendant, but only the restoration and maintenance of the natural condition.

IDEM—APPEAL—MODIFYING DECREE.

3. Where, in an action to restrain the obstruction by artificial works of the flow of water through a natural depression in the bank of a stream, it is claimed that such works could be maintained with great benefit to defendant, and without injury to plaintiff, during a portion of the season, but the evidence and findings do not show during what times this might be done, the appellate court should not modify an injunction decree so as to permit such works to be maintained at any time, but will leave such matter for the trial court.

From Harney: MORTON D. CLIFFORD, Judge.

Suit by Homer B. Mace against F. L. Mace for an injunction. The facts appear in the opinion. There was a decree for plaintiff, and defendant appeals.      MODIFIED.

For appellant there was a brief over the name of *Parrish & Rembold,* with an oral argument by *Mr. Chas. W. Parrish.*

For respondent there was a brief and an oral argument by *Mr. Lionel R. Webster.*

Mr. Chief Justice Bean delivered the opinion.

The object of this suit is to restrain the defendant from interfering with the flow of water from Silvies River onto plaintiff's land through an alleged natural channel. Some four or five miles below where the river debouches into Harney Valley it divides into two branches, called respectively the "East" and "West" Fork. From this point down to Malheur Lake the East Fork has a fall of not to exceed one and one half feet to the mile, and its banks are somewhat higher than the land a short distance from the river. The land lying between the forks, known as the "Island," is naturally irrigated, during the spring freshets, by the water from the river flowing out through natural sloughs or depressions. It is very productive when so irrigated, but valueless without. The defendant owns one hundred and sixty acres on the East Fork, a short distance between where it branches from the main river; and the plaintiff owns a like quantity of the "Island" land, south of and adjoining that of the defendant, and situated about a quarter of a mile from the East Fork. At the upper end of the defendant's land there is, and has been from time immemorial, a natural depression or slough, through which the water has been accustomed to flow during high water onto plaintiff's land, and from thence gradually finding its way to the river and lake below. In 1888 the defendant, with the permission and consent of the predecessors in interest of the plaintiff, constructed a ditch from a point on or near the south line of the land now owned by plaintiff and onto another tract belonging to him, for the purpose of utilizing the surplus water from plaintiff's land for irrigating purposes, and at the same time put in the bank of the river at the head of the slough a box or flume two feet deep and four feet wide, filling up the depression on either side, and by means of adjustable dams above and below, constructed by himself and one Levins, raising the water in the stream so that it flowed out through the box or flume in greater quantities

and later in the season than it was accustomed to do when the river and bank were in their natural condition. In 1898 he replaced this box with a larger one, four feet deep, four feet wide, and sixteen feet long, but no water was ever taken through it, because in the spring of 1898 he caused it to be closed up, and made arrangements to obtain water for irrigation on his lower tract by means of a ditch tapping the river further down. . This suit was commenced in 1899 to prevent defendant from interfering with the flow of water through the slough or depression referred to. The complaint alleges, in effect, the facts as above stated. The answer denies its material allegations, except plaintiff's title, and avers that what plaintiff asserts to be a natural slough is nothing more than a ditch made by the defendant for the purpose of turning water through and over the plaintiff's lands and onto the lands owned by him below. The court found that the slough or depression referred to was and is a natural water course, and that plaintiff was entitled to have such a quantity of water flow through it as would naturally flow through the head gate put in by the defendant in 1898, when raised four inches above the bottom of the flume, and entered a decree to that effect, giving the plaintiff the right to enter upon the lands of the defendant at any and all times to repair the head gate and to regulate the flow of water through the same, and, if necessary, to construct a new line in lieu thereof. From this decree the defendant appeals.

There are substantially but two questions presented by the record: (1) Whether the depression or slough near the upper line of defendant's land is a natural water course; and (2) if so, to what relief is the plaintiff entitled?

1. Upon the first question there is considerable testimony. It is substantially agreed, however, by the witnesses on both sides that from time immemorial there has been a natural slough or depression at the point referred to from fifteen to twenty feet wide, through which the water was accustomed to flow annually during the high water in the spring, until obstructed by defendant, and by which the plaintiff's land was

irrigated and made to produce large and valuable crops of wild hay. Mr. Philbrick, an engineer of intelligence and experience, who made a survey and plat of the premises with a view to testifying in this suit, says that there was a depression in the ground at the point where defendant's head gate is now situated, which was apparently a natural water course; that for about seven hundred and fifty feet from that point down toward the lands of the plaintiff there is a well-defined crooked channel, about two feet wide on the bottom, and ten feet across at the top, and one and one half feet deep; that water flowing through such channel spreads out over the lands of the plaintiff in the form of a lake or pond for perhaps one thousand feet further down, when it again flows through small cuts or sloughs to a point near the south line of plaintiff's claim, when it is again taken up by a ditch six feet wide and from one and one half to two feet deep, leading down onto the lands owned by the defendant. It thus appears from the testimony of this witness, and he is corroborated by all the other witnesses, that for some distance from the river there is a natural, well-defined channel or ravine, through which the water was accustomed to flow during the irrigating season; and, while it may not be sufficient to conform to the technical definition of a water course as given in some of the books, yet, taking into consideration the nature and character of the river and country, and the manner of irrigation, we think that the water flowing through it must be held to partake more of the nature of a natural stream than of ordinary overflow or surface water, and is governed by the rules applicable to waters flowing in such streams, to the extent, at least, that the defendant cannot, by damming up the outlet and changing the banks of the stream, interfere with or divert the water which would naturally flow through such depression, to the injury of the plaintiff: *West* v. *Taylor,* 16 Or. 165 (13 Pac. 665); Gould, Waters, § 264; *Cox* v. *Bernard,* 39 Or. 53 (64 Pac. 860).

The next question is as to the decree that should be entered under the circumstances. The defendant, as a riparian proprietor, is entitled to have the water of the stream flow as

it was wont to do under natural conditions, and to that end he
has a right to maintain the banks at their usual or natural
height: *Cox* v. *Bernard,* 39 Or. 53 (64 Pac. 860). So that this
branch of the case turns upon the proof as to the size and depth
of the depression or slough at the point where it leaves the
river, and, when that is ascertained, the defendant should be
compelled to restore the bank to its natural condition. The
evidence regarding the depth of the slough varies according to
the recollections of the witnesses, and tends to show that it was
from six inches to two and one half feet deep. But without in-
cumbering this opinion with quotations from the testimony,
which consist largely of the recollection of witnesses of ob-
servations made many years ago, it is sufficient to say that we
are of the opinion that the probable average depth was about
two feet. This conclusion is reached largely from the fact that
the head gate or flume put in by the defendant in 1888 was
evidently intended to be about the same depth as the natural
depression in the bank, and, aided by the dams put in at the
same time, to carry about the same amount of water. It was
so used for ten years without objection from any one, and
seems to have been entirely satisfactory to all concerned. The
amount of extra water caused by the dams is not shown by the
testimony, nor can it be considered in determining the ques-
tions involved in this case. The dams are the property of the
defendant and Levins, and their future maintenance depends
wholly upon the pleasure of their owners. The case in hand
must be determined without reference to these artificial struct-
ures, and, when so considered, we are of the opinion that, if an
opening two feet deep and fifteen feet wide is left in the bank
at the place where the head gate is now situated, it will practi-
cally restore the bank to its natural condition.

2. The decree of the court below would doubtless afford sub-
stantial justice between the parties if it was believed to be
within the authority of the court to make, but the plaintiff is
not entitled to the waters of the stream by virtue of any con-
tract with the defendant, or by prior appropriation. His
rights depend alone on the fact that he is a riparian proprietor

upon a natural water course, and all that he is entitled to is a decree restoring such water course and its intake to their natural condition. The court has no authority in this suit to make a decree allowing or permitting him to maintain a head gate or flume in the bank of the river on the defendant's land, nor to go upon such land for the purpose of regulating the flow of water. All it can do is to compel the defendant to restore the bank to its natural condition, and permit it so to remain.

A contention is made that, because the permanent part of the dam put in by the defendant is about two feet high, he is entitled to raise the bank at the head gate at least eighteen inches. But the evidence shows that a very slight raise in the water at the point where the dam is located will cause the stream to flow back and through the West Fork, unless prevented by what is known as the "Levins Dam," over which neither party to this suit has any control. And, moreover, as already suggested, the dam is an artificial structure, put into the stream by the defendant, and its future maintenance depends entirely upon his will.

A decree will be entered here in accordance with this opinion, and the cause remanded to the court below, with directions to enforce such decree; plaintiff to recover costs in this court and the court below.                    MODIFIED.

Decided 28 April, 1902.

ON MOTION FOR REHEARING AND FOR MODIFICATION OF DECREE.

MR. CHIEF JUSTICE BEAN delivered the opinion.

3. The defendant moves for a modification of the decree heretofore entered, so as to permit him to raise the bank of the stream at the place where the cut is directed to be made whenever he raises the water by artificial means; the purpose being to permit him to confine the water within the channel when it is raised by means of the dams erected by himself and Levins. In support of the motion, it is said that a great portion of the time during the irrigating season the water will not be high enough to run out through the natural channel; that during

such times defendant can use it for irrigating his riparian lands by raising it by means of artificial dams, but in order to do so it will be necessary to close the cut referred to during the times he is so using the water. This point was not developed by the testimony, nor does the record show, except in a general way, at what time of the year the water will naturally flow down to plaintiff's land. The court below found that annually, from about the first of April to July 15, the water has from time immemorial run down through the natural channel referred to, but as to whether the flow is continuous or not the evidence and findings are silent. If the defendant's position is correct, it would perhaps be equitable and just to allow the desired modification, if, under the facts, a decree could be so framed as to protect the rights of the plaintiff. But to permit defendant to determine for himself when he may raise the bank would, it is believed, tend to further litigation, and, in practical effect, destroy the value to the plaintiff of the decree heretofore rendered. If, when the case goes back to the court below for enforcement of the decree, it is made to appear to that court that a decree can be framed fixing definitely the date or dates when the defendant can raise the bank without interfering with the rights of the plaintiff, it is authorized, if it deem it proper, to frame such a decree.

The petition for rehearing and motion for modification of the decree are denied and overruled, except as above indicated.

REHEARING DENIED.